Joy Smith, Esq. [SBN: 191622]
The Libra Law Firm
3370 Peachtree Rd NE 700 123,
Atlanta, GA 30326
Phone: 855.Libra.55
Fax: 855. Libra.11
JSmith@TheLibraLawFirm.com

Attorney for Plaintiffs, David Justin Freeman, Charlie Freeman, Mindy Sue Freeman and Freddie Freeman.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT COURT OF GEORGIA - GAINESVILLE DIVISION

| | |
|---|---|
| DAVID JUSTIN FREEMAN, an individual; CHARLIE FREEMAN, an individual; MINDY SUE FREEMAN, an individual; and FREDDIE FREEMAN, an individual.<br><br>Plaintiffs,<br>vs.<br><br>CITY OF TOCCOA; STEPHENS COUNTY; DONDI NELSON, an individual;  CHRISTOPHER JAKE PALMER, an individual;  RANDY SHIRLEY, an individual;  MATTHEW VANDIVER, an individual; AUSTIN GREER, an individual;  KYLAR JAMESON, an individual; TIM HILL, an individual; BRANDI ROBINSON, an individual;  NICHOLAS MOAVERO, an individual;  RAY DEAN, an individual; TIM KELLY, an individual; ANGEL DIXON, an individual; and RON NESBITT, an individual; AND DOES 1 TO 100, INCLUSIVE.<br><br>Defendants | Case No.:<br><br>**COMPLAINT**<br><br>1. First Amendment Violations of Freedom of Speech;<br>2. Fourth Amendment Violations of Unreasonable Search and Seizure;<br>3. Fourth Amendment Violations of Warrantless Arrest Without Probable Cause;<br>4. Fourth Amendment Violations of Excessive Force and Improper Use of Deadly Weapons;<br>5. Constitutional Violations of Unlawful Imprisonment;<br>6. 14th Amendment Violations Malicious Prosecution;<br>7. Municipal Liability (Monell 42 U.S.C. § 1983).<br>8. Vicarious Liability;<br>9. Defendants Are Not Entitled to Qualified Immunity.<br><br>**(DEMAND FOR JURY TRIAL)** |

COMPLAINT

1

All Plaintiffs David Justin Freeman, an individual; Charlie Freeman, an individual; Mindy Sue Freeman, an individual; and Freddie Freeman, an individual; brings this Complaint and allege:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331, which grants the U.S. district Courts original jurisdiction over civil actions arising under the Constitution;

2. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1343, which grants the U.S. district Courts original jurisdiction for any person in a civil action to recover damages for injuries sustained because of deprivation of any right or privilege to a citizen of the United States;

3. This Court has subject matter jurisdiction over this action under 42 U.S.C. §1983, which grants the U.S. district Courts jurisdiction and allows individuals to sue state and local government officials for civil rights violations, constitutional right violations or federal rights violations under the "color of allow" doctrine;

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same nucleus of operative facts as Plaintiff's federal claims.

5. This Court has subject matter jurisdiction over this action under 42 U.S.C. §1988, which grants the U.S. district Courts jurisdictions over civil and criminal cases;

6. This Court has subject matter jurisdiction over this action pursuant to the First Amendment, under *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), which prohibits government officials from wielding their power selectively to punish or suppress speech;

7. This Court has subject matter jurisdiction over this action pursuant to the Fourth Amendment, under *Terry v. Ohio*, 392 U.S. 1 (1968), which prohibits unreasonable search and seizure;

8. This Court has subject matter jurisdiction over this action pursuant to the Fourth Amendment, under *Barnes v. Felix*, 605 U.S. 73 (2025), which prohibits warrantless arrests without probable cause;

9. This Court has subject matter jurisdiction over this action pursuant to the Fourth Amendment under *Graham v. Connor*, 490 U. S. 386, 397 (1989), which prohibits a law enforcement officer's use of deadly force when it is not "objectively reasonable";

10. This Court has subject matter jurisdiction over this action pursuant to the Fourth Amendment under *Tennessee v. Garner*, 471 U. S. 1, 9 (1985), which prohibits a law enforcement officer's use of deadly force when the "totality of the circumstances" does not justify so;

11. This Court has subject matter jurisdiction over this action under 18 U.S.C. §1584, which grants the U.S. district Courts original jurisdiction and any person civil and criminal remedies to any person unlawfully imprisoned;

12. This Court has subject matter jurisdiction over this action under 10 U.S.C. §897, which grants the U.S. district Courts original jurisdiction and any person civil and criminal remedies to any person unlawfully imprisoned;

13. This Court has subject matter jurisdiction over this action pursuant to the Sixth Amendment, under *Baker v. Wingo*, 407 U.S. 514 (1972). The Sixth Amendment guarantees the right to a speedy and public trial in criminal prosecutions, preventing undue incarceration and limiting impairment of the defense;

14. This Court has subject matter jurisdiction over this action pursuant to the Eighth Amendment, under *Weems v. United States*, 217 U.S. 349 (1910). The Eighth Amendment prohibits cruel and unusual punishment;

15. This Court has subject matter jurisdiction over this action pursuant to the Eighth Amendment, under *Estelle v. Gamble*, 429 U.S. 97 (1976), which prohibits "deliberate indifference" to an inmate's serious medical needs and constitutes cruel and unusual punishment under the Eighth Amendment and violates their constitutional rights;

16. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1621 which requires proof of willful, knowingly false statements, while holding that technically true but evasive answers are not criminal;

**COMPLAINT**
3

17. This Court has subject matter jurisdiction over this action pursuant to *Bronston v. United States*, 409 U.S. 352 (1973), where the US Supreme Court ruled that perjury requires deliberate falsity, not merely misleading answers, and requires strong evidence of intent to deceive;

18. This Court has subject matter jurisdiction over this action pursuant to the Fourteenth Amendment under *McDonald v. Smith*, 472 US 479 (1985), where the US Supreme Court held that the First Amendment does not offer absolute immunity for defamation;

19. This Court has subject matter jurisdiction over this action pursuant to the Fourteenth Amendment under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), where the U.S. Supreme Court decision ruled that private individuals do not need to prove "actual malice" to recover damages for defamation. The Court determined private figures need more protection than public figures, allowing states to set lower standards of fault such as negligence to prove defamation, provided they don't allow punitive damages without actual malice;

20. This Court has subject matter jurisdiction over this action pursuant to the Fourteenth Amendment under *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), where the Supreme Court defined "malice" in a claim of defamation or libel, as the defendant knew that a statement was false or with reckless disregard for whether it was false or not;

21. This Court has subject matter jurisdiction over this action pursuant to the Fourteenth Amendment under *Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024), where the Supreme Court held that malicious-prosecution claims can proceed even if only one charge in a criminal proceeding lacks probable cause;

22. This Court has subject matter jurisdiction over this claim under US Supreme Court case of *Hustler v. Falwell*, 485 U.S. 46 (1988), where the Supreme Court held that to establish the elements for Intentional Infliction of Emotional Distress (IIED), it requires proving: (1) extreme/outrageous conduct exceeding civilized decency, (2) intent or recklessness, (3) causation, and (4) severe emotional distress;

23. This Court has subject matter jurisdiction over this claim under *Burlington Industries, Inc. v. Ellerth*, where the US Supreme Court held that employers are liable if supervisors create hostile work environment;

24. This Court has subject matter jurisdiction over this claim under *Vance v. Ball State University*, 570 U.S. 421 (2013), where the US Supreme Court held that a supervisor is someone with the power to fire, demote, promote, transfer, or discipline. The Court factored: 1) background check failures; 2) inadequate monitoring; 3) dangerous employees; 4) unsuitability for the role; 5) employer's knowledge of unsuitability;

25. This Court has subject matter jurisdiction over this claim under *Pearson v. Callahan*, 555 U.S. 223 (2009), where the US Supreme Court implemented a two-part test to determine if this immunity applies: (1) whether the official violated a constitutional right, and (2) whether that right was clearly established at the time of the misconduct;

26. Venue is proper in the Northern District of Georgia, Gainesville Division, pursuant to 28 U.S.C. §1391(b)(2) as all acts, events or omissions given rise to this claim occurred in Stephens County, Georgia.

### PARTIES

27. Plaintiff David Justin Freeman, an individual, resides in Toccoa, Georgia and submits himself to the jurisdiction of this Court;

28. Plaintiff Charlie Freeman, an individual, a minor, by and through his guardian ad litem and his mother, Mindy Sue Freeman, resides in Toccoa, Georgia and submits himself to the jurisdiction of this Court;

29. Plaintiff Mindy Sue Freeman, an individual, resides in Toccoa, Georgia and submits herself to the jurisdiction of this Court;

30. Plaintiff Freddie Freeman, an individual, a minor, by and through his guardian ad litem and his mother, Mindy Sue Freeman, resides in Toccoa, Georgia and submits himself to the jurisdiction of this Court;

31. Defendant City of Toccoa ("COT") is a municipal governmental entity that is legally competent to sue and be sued. Defendant COT's policies, practices, and customs were the moving force behind the constitutional and statutory violations set out in this lawsuit. Defendant COT is subject to the jurisdiction of this Court. Defendant COT maintains its office at 92 N Alexander St, Toccoa, GA 30577 and may be served upon its office;

32. Defendant Stephens County ("SC") is a municipal governmental entity that is legally competent to sue and be sued. Defendant SC's policies, practices, and customs were the moving force behind the constitutional and statutory violations set out in this lawsuit. Defendant SC is subject to the jurisdiction of this Court. Defendant SC maintains its office at 70 N Alexander St, Suite 205, Toccoa, GA 30577 and may be served upon its office;

33. Defendant Dondi Nelson, an individual, is and was at all times relevant to this action, a law enforcement officer employed by the Stephens County Sheriff's Office and was acting under "color of law" doctrine. Defendant Nelson is subject to the jurisdiction of this Court and may be served at 1095 S. Pond St, Toccoa, Georgia 30577;

34. Defendant Tim Hill, an individual, is and was at all times relevant to this action, a law enforcement officer employed by the Stephens County Sheriff's Office and was acting under "color of law" doctrine. Defendant Hill is subject to the jurisdiction of this Court and may be served at 92 N. Alexander Street, Toccoa, Georgia 30577;

35. Defendant Kylar Jameson, an individual, is and was at all times relevant to this action, a law enforcement officer employed by the Stephens County Sheriff's Office and was acting under "color of law" doctrine. Defendant Jameson is subject to the jurisdiction of this Court and may be served at 70 N. Alexander Street, Suite 205, Toccoa, Georgia 30577;

36. Defendant Sheriff Randy Shirley is and was at all times relevant to this action, a law enforcement officer employed by the Stephens County Sheriff's Office and was acting under "color of law" doctrine. Defendant Shirley is subject to the jurisdiction of this Court and may be served at 3645 Historic Highway 17, Martin, Georgia 30557;

37. Defendant Deputy Sheriff Nicholas Moavero is and was at all times relevant to this action, a law enforcement officer employed by the Stephens County Sheriff's Office and was acting under "color of law" doctrine. Defendant Moavero is subject to the jurisdiction of this Court and may be served at 70 N. Alexander Street, Suite 205, Toccoa, Georgia 30577;

38. Defendant Brandi Robinson is and was at all times relevant to this action, a law enforcement officer employed by the Stephens County Sheriff's Office and was acting under "color of law" doctrine. Defendant Robinson is subject to the jurisdiction of this Court and may be served at 70 N. Alexander Street, Suite 205, Toccoa, Georgia 30577;

39. Defendant Tim Kelly is and was at all times relevant to this action, a law enforcement officer employed by the City of Toccoa Police Department and was acting under "color of law" doctrine. Defendant Kelly is subject to the jurisdiction of this Court and may be served at 92 N. Alexander Street, Toccoa, Georgia 30577;

40. Defendant Jimmy Mize is and was at all times relevant to this action, a law enforcement officer employed by the City of Toccoa Police Department and was acting under "color of law" doctrine. Defendant Mize is subject to the jurisdiction of this Court and may be served at 70 N. Alexander Street, Toccoa, Georgia 30577;

41. Defendant Ron Nesbitt is and was at all times relevant to this action, a law enforcement officer employed by the City of Toccoa Police Department and was acting under "color of law" doctrine. Defendant Nesbitt is subject to the jurisdiction of this Court and may be served at 92 N. Alexander Street, Toccoa, Georgia 30577;

42. Defendant Angel Dixon is and was at all times relevant to this action, a law enforcement officer employed by the City of Toccoa Police Department and was acting under "color of law" doctrine. Defendant Dixon is subject to the jurisdiction of this Court and may be served at 92 N. Alexander Street, Toccoa, Georgia 30577;

43. Defendant Jake "The Punisher" Palmer is and was at all times relevant to this action, a law enforcement officer employed by the City of Toccoa Police Department and was acting under "color of law" doctrine. Defendant Palmer is subject to the jurisdiction of this Court and may be served at 92 N. Alexander Street, Toccoa, Georgia 30577;

44. Defendant Austin Greer is and was at all times relevant to this action, a law enforcement officer employed by the Georgia State Patrol and was acting under "color of law" doctrine. Defendant Greer is subject to the jurisdiction of this Court and may be served at 959 United Ave SE, Atlanta, GA 30316;

45. Defendant Ray Dean is and was at all times relevant to this action, a law enforcement officer employed by the Georgia State Patrol and was acting under "color of law" doctrine. Defendant Dean is subject to the jurisdiction of this Court and may be served at 959 United Ave SE, Atlanta, GA 30316;

46. Defendant Matthew Vandiver is and was at all times relevant to this action, a law enforcement officer employed by the Georgia State Patrol and was acting under "color of

law" doctrine. Defendant Vandiver is subject to the jurisdiction of this Court and may be served at 959 United Ave SE, Atlanta, GA 30316;

47. Plaintiffs does not know the true names and capacities of those Defendants designated as DOES 1 through 100. Inclusive, but alleges that each of said fictitiously named Defendants was negligently and unlawfully responsible for the events hereinafter described and for the injuries and damages sustained by Plaintiffs. Plaintiffs will ask leave of Court to amend this allegation when the identity of each said fictitiously named Defendants has been ascertained;

48. Plaintiffs are informed and believes and thereon alleges that each of the Defendants sued herein as a DOE is responsible in some manner for the events and happenings herein referred to, thereby contributing as a substantial factor in bringing about the injuries and damages to Plaintiffs as herein alleged;

49. Plaintiffs are informed and believes and thereon alleges that, at all times herein mentioned, Defendant STEPHENS COUNTY SHERIFF'S DEPARTMENT, and DOES 1 through 33, Inclusive;

50. Plaintiffs are informed and believes and thereon alleges that, at all times herein mentioned, Defendant CITY OF TOCCOA POLICE DEPARTMENT, and DOES 34 through 66, Inclusive;

51. Plaintiffs are informed and believes and thereon alleges that, at all times herein mentioned, Defendant GEORGIA STATE PARTOL, and DOES 67 through 100, Inclusive.

## FACTS

52. Plaintiff David Justin Freeman ("Plaintiff Mr. Freeman"), is a father, a farmer, a teacher and church leader;

53. Prior to the incident, Plaintiff Mr. Freeman taught children music, how to build robots and software development;

54. On June 29, 2024, at 9:46AM, Plaintiff Mr. Freeman and his then eleven-year-old son, ("Plaintiff Charlie"), entered the Home Depot in Toccoa, Georgia;

55. Inside, Plaintiff Mr. Freeman saw Defendant Nelson, who was then a Sheriff's deputy from across the registers;

56. Defendant Nelson was shopping at the Home Depot, dressed in deputy sheriff's uniform and was working on the clock;

57. Prior to the incident, Defendant Nelson worked as a jailer for Stephens County where he was let go and was "[N]ot eligible for rehire";

58. Prior to the incident, Defendant Nelson had repeated disciplinary problems as a deputy between 2021 and the date of this incident. For instance, multiple complaints of Defendant Nelson were emailed by the fire department chief, Bryon Bennett, who described Defendant Nelson as "hostile" and "verbally abusive" towards fire fighters;

59. At the time of the incident, Plaintiff Mr. Freeman made an overall political comment about police in general to Lori Overall, a colleague and a Home Depot employee;

60. Plaintiff Mr. Freeman never engaged in any conversation with Defendant Nelson;

61. Plaintiff Mr. Freeman never made any threats nor used any profanity laced language towards the police nor Defendant Nelson;

62. Defendant Nelson did not have his body camera footage recording;

63. Defendant Nelson did not record any of the alleged interaction;

64. Prior to the present incident, Defendant Nelson had a history of disciplinary actions taken against him for not having his body camera recording;

65. Under Georgia Code §50-18-96 (2024), law enforcement officers are required to retain or have their body camera footage recording;

66. At 9:47AM, and 67 seconds after entering the Home Depot, Plaintiff Mr. Freeman left the Home Depot and proceeded to walk to his truck with his son;

67. The father and son duo continued to their parked truck;

68. At 9:48AM, Defendant Nelson left the Home Depot and attempted to follow Plaintiff Mr. Freeman to his truck;

69. As Defendant Nelson walked around the Home Depot parking lot, Plaintiff Mr. Freeman safely backed out of his parking space safely;

70. Plaintiff Mr. Freeman drove away from the Home Depot parking lot and was heading home on rural Highway 17;

71. Highway 17 has a speed limit of 50 miles per hour;

COMPLAINT

9

72. Several video recordings of the incident from different angles clearly show Plaintiff Mr. Freeman safely backing up with great distance between Plaintiff Mr. Freeman's vehicle and Defendant Nelson;

73. Defendant Nelson ran across the parking lot to his patrol vehicle and aggressively began to pursue the Plaintiffs;

74. At 9:49AM, Defendant Nelson caught up to the Plaintiffs and radioed dispatch to run Plaintiff Mr. Freeman's vehicle tag number;

75. At 9:51AM, Defendant Nelson turned on his blue lights and siren to stop Plaintiff Mr. Freeman;

76.  Plaintiff Charlie began recording the interaction;

77. Plaintiff Mr. Freeman travelled less than 20 miles per hour after Defendant Nelson turned on his lights;

78. Plaintiff Mr. Freeman rolled down his windows and communicated to Defendant Nelson that he was looking for a safe and populated area to stop;

79. In Plaintiff Charlie's video it shows Mr. Freeman stopped at a red traffic light and waited for the light to turn green before proceeding;

80. Plaintiff Mr. Freeman made a U-Turn and headed back towards the Home Depot;

81. Defendant Nelson deceived dispatch by claiming he was in hot pursuit of a high-speed chase instead of being stopped right behind Plaintiff Mr. Freeman's vehicle at a red traffic light;

82. The videos clearly show Plaintiff Mr. Freeman drove slowly for less than two miles over the course of approximately five minutes and forty seconds while attempting to locate a safe and populated location to stop;

83. Despite having new dash cameras in his vehicle, Defendant Nelson had his vehicle dash cameras turned off. No video was recovered from this incident by Defendant Nelson's dash camera;

84. At 9:56AM, Defendant Nelson and Defendant Jake "The Punisher" Palmer, of the Toccoa Police Department, surrounded Plaintiff Mr. Freeman's vehicle in the Home Depot parking lot;

85. Defendant Palmer had the intent "to box him in";

**COMPLAINT**
10

86. Defendant Nelson intentionally collided his vehicle into Plaintiff Mr. Freeman's vehicle;

87. Plaintiff Mr. Freeman's airbags deployed;

88. Defendant Nelson came out of his patrol vehicle without any harm or injury;

89. Defendant Nelson pulled out his gun and aimed directly at the 11-year-old Plaintiff Charlie;

90. Defendant Palmer pulled out his gun and aimed his gun directly at Plaintiff Mr. Freeman;

91. Thereafter, Defendants Nelson and Palmer, and at least ten other responding Defendants held Plaintiffs Mr. Freeman and his eleven-year-old son Plaintiff Charlie at gunpoint using pistols, handguns, shotguns and semi-automatic weapons such as AR15s as seen in the videos;



92. The Defendants came from Habersham County, Franklin County and Stephens County;

93. At 10:00 AM, Defendants Nelson and Palmer, heard Plaintiff Mr. Freeman cry out from his vehicle saying "We are Christians. We believe in the bible. We don't believe in trying to stop people and attack them for no reason. Only because they expressed anti-police views. That's what this is about. I am not obligated to comply with unlawful orders and these are unlawful orders.";

94. After the collision, while still at gunpoint, confused and fearing for his life and the life of his 11-year old son, Plaintiff Mr. Freeman called 911 explaining to the operator what was happening;

95. The 911 operator called Defendant Palmer and told him that Plaintiff Mr. Freeman asked to talk to his lawyer;

96. At 10:08 AM, Defendant Palmer instructed the 911 operator to "hang up the phone with him" while still pointing his gun at Plaintiff Mr. Freeman;

97. At 10:21 AM, from video surveillance, Plaintiff Mr. Freeman can be heard screaming "I want a lawyer here immediately" and Defendants replying to him saying " [W]e will get you a lawyer. You need to come out peacefully." Mr. Freeman replied with "I want a lawyer here first";

98. At 10:23 AM, Defendant Ron Nesbitt texted Mr. Freeman "Who's ur lawyer sir". To which Mr. Freeman texted a reply back "Brock Johnson, Gainsville";

99. At 10:24 AM, Mr. Freeman was still sitting in his vehicle and telephoned his then pregnant wife Mindy Sue to wish her his last goodbyes;

100. At 10:25 AM, despite Plaintiff Mr. Freeman peacefully sitting in his vehicle, Defendants falsely claimed that they had no choice but to shoot Plaintiff Mr. Freeman because he attacked them first. Defendants then smashed both Plaintiff Mr. Freeman's driver's side window and the passenger side window;

101. At 10:25 AM, Defendants tased Plaintiff Mr. Freeman with two separate tasers;

102. Tasers are considered deadly weapons. *Eberhart v. State*, 307 Ga. 254, 261 (2) (a) (835 SE 2d 192) (2019);

103. At 10:25 AM, Defendants violently removed the 11-year-old Plaintiff Charlie from the vehicle;

**COMPLAINT**
12

104. Defendant Nelson, held the 11-year-old Plaintiff Charlie's head in a headlock, wrestled him to the ground and put him in a chock hold;

105. By this time, the 11-year-old Plaintiff Charlie suffered injuries to his head and had a bloody leg;

106. After the Plaintiff Charlie was removed from the vehicle and while Plaintiff Mr. Freeman was paralyzed, from being shocked by the taser, Defendant Jake "The Punisher" Palmer entered the vehicle from the passenger's side and where 11-year-old Plaintiff Charlie was sitting;

107. Plaintiff Mr. Freeman was not violent nor resisting an arrest;

108. Defendant Palmer began to repeatedly, savagely and violently beat and punched Plaintiff Mr. Freeman's back;

109. Defendants even removed Plaintiff Mr. Freeman's shirt so that Defendant Palmer could tase with a third taser on his bare skin to hurt more;

110. The videos clearly show the instant Defendant Palmer broke Mr. Freeman's ribs;

111. Defendant Vandiver vigorously and repeatedly struck Plaintiff Mr. Freeman in the head causing lacerations and bleeding;

112. Defendant Robinson enjoyed and laughed at Plaintiff Mr. Freeman being tased and beaten;

113. At 10:27 AM, Plaintiff Mr. Freeman was removed from the vehicle with nine Defendants surrounding him and placing him in a chokehold on the ground;

114. At 10:27 AM, while Plaintiff Mr. Freeman was cuffed on the ground and surrounded by nine different Defendants, the Stephens County head Sheriff Shirley decided to jump up and down on Plaintiff Mr. Freeman's leg while he wore cowboy boots;

115. As a result of this incident, Plaintiff Mr. Freeman suffered blunt trauma to his head;

116. Plaintiff Mr. Freeman's face was covered in blood;

117. Plaintiff Mr. Freeman suffered broken ribs;

118. Plaintiff Mr. Freeman had glass stuck in his elbow and many other physical injuries;

119. Plaintiff Mr. Freeman called out to the Defendants "What crime did I initially commit that initiated the stop? Name it? Name the crime? You can't because there isn't one." and "You threatened to murder children today for no reason.";

**COMPLAINT**
13

120. The Defendants went silent and could not name a single offense;

121. The Defendants never read Plaintiffs their Miranda Rights;

122. The Defendants struck the 11-year-old boy's head against one of the Defendants' Patrol vehicles;

123. The Defendants arrested the 11-year-old Plaintiff Charlie and put him in jail;

124. Defendants never read Plaintiff Charlie his Miranda Rights;

125. After the beating, Defendant Nelson deceptively said "[H]e backed that red truck up, like he 'bout to hit me" was the reason for the arrest;

126. Plaintiff Mr. Freeman was then told he would be charged with aggravated assault;

127. The Defendants attempted to question the 11-year-old Plaintiff Charlie without his parents nor lawyer;

128. Plaintiff Charlie refused to answer the questions;

129. The Defendants told Plaintiff Mindy Sue that they would not release her 11-year-old son Plaintiff Charlie, unless she answered some questions;

130. Plaintiff Mindy Sue refused to answer any questions;

131. Only after Plaintiff Mindy Sue threated Defendants with a lawyer did the Defendants release her son Plaintiff Charlie to her;

132. Plaintiff Mr. Freeman was falsely imprisoned for over six months;

133. In the state of Gorgia, under O.C.G.A. § 50-21-26(a)(2), a written "ante litem notice" must be given within six months of the date of the incident;

134. Due to this false imprisonment and since this statute does not toll while in prison in Georgia, Plaintiff Mr. Freeman was barred from asserting a claim in Gorgia State Court;

135. While imprisoned, Plaintiff Freeman was denied medical treatment and medical care throughout the duration of his incarceration;

136. Due to the extreme stress from this incident, Plaintiff Mindy Sue prematurely delivered Plaintiff Freddie Freeman;

137. Plaintiff Freddie Freeman was born with several permanent birth defects as a direct result of this incident;

138. The Plaintiffs as a family suffered economic, reputational and societal damages as direct result of this incident;

**COMPLAINT**

14

139. None of the Defendants were injured from this incident;

140. Defendants were all covered in Plaintiff Mr. Freeman's blood after the attack;

141. An unjustified arrest is considered kidnapping in Georgia;

142. Georgia common law allows one the "right to shun an illegal arrest by flight. The exercise of this right should not, and would not, subject him to be arrested as a fugitive." *Thomas v State*, 91 Ga. 204, 206 (2) (18 S.E. 305) (1892);

143. An officer cannot attempt an illegal arrest... and then justify the attempt on the ground that the person sought to be arrested would not stand still until the arrest was made, but ran away to avoid it." *Id*;

144. In *Colman v. State*, 121 Ga. 594, 599 (49 S.E. 716) (1905), the Court held "an unlawful arrest is an assault that justifies the person in breaking away, resisting, and repelling force with force";

145. In *Glen v. State*, the Court held that "the common-law right to resist an unlawful arrest includes the right to use proportionate force against government property to escape an unlawful detention following the arrest. 296 Ga. 509, 769 S.E.2d 378 (2015);

146. A warrant for simple assault was not signed by a judge nor did it list a name of judge was issued against Mr. Freeman one day after the incident on June 30, 2024, based solely on Defendant Nelson's report;

147. This warrant included all the same misspellings and grammatical errors that Defendant Nelson made on the police report that Defendant Nelson created;

148. A second warrant was issued for disorderly conduct was issued on July 9, 2024. Ten days after the incident. This warrant also did not include a judge's name nor signature;

149. Defendant Nelson was later disciplined for this incident for turning off his cameras;

150. Two months later, Defendant Nelson was disciplined again for another similar incident;

151. Within six months, six of the thirteen Defendants resigned;

152. By August 29, 2024, Defendant Nelson resigned from the Stephens County Sheriff's Office;

153. By December 31, 2024, Defendant Nelson's direct supervisor, Defendant Hill resigned;

154. By December 31, 2024, Defendant Hill's direct supervisor, Defendant Jameson resigned;

**COMPLAINT**
15

155. By December 31, 2024, Defendant Jameson's direct supervisor, Defendant Shirley resigned;

156. Defendant Kelly resigned on August 29, 2024;

157. Defendant Mize resigned on August 29, 2024;

158. Perjury is considered a felony;

159. On October 1, 2024, while Defendant Nelson was under oath and sworn in testimony for the "motion to revoke bond", Defendant Nelson maliciously and falsely testified that Plaintiff said to him at the Home Depot "[Y]ou're a piece of shit, you need to die. And then at that time, the manager of the manager walked in between us at the counter.";

160. On October 1, 2024, while Defendant Nelson was under oath and sworn in testimony for the "motion to revoke bond", Defendant Nelson falsely testified he turned his "blue lights on" while all parties were still in the Home Depot parking lot and before Plaintiff Mr. Freeman exited the Home Depot parking lot;

161. On October 1, 2024, while Defendant Nelson was under oath and sworn in testimony, on the "motion to revoke bond", Defendant Nelson testified that he was not placed in any reasonable apprehension of Plaintiff Mr. Freeman's vehicle when he pulled out of the parking space. Defendant Nelson testified that Plaintiff Mr. Freeman "came approximately probably about maybe about five feet. So, he had the opportunity to reverse-reverse";

162. In the same court proceeding on October 1, 2024, while under oath Defendant Nelson further testified about the initial back-up in Court stating that "I did not have probable cause at that time";

163. In the same court proceeding on October 1, 2024, while under oath Defendant Nelson further testified about the high-speed chase in Court stating that he was moving "20 miles an hour";

164. Defendant Nelson further falsely testified under oath on October 1, 2024, claiming that Plaintiff Mr. Freeman "ran the stop sign across from Memorial on Walmart Way". There is no stop sign across from Memorial Drive on Walmart Way. Memorial Drive and Walmart Way do not intersect;

165. Defendant Nelson further falsely testified under oath on October 1, 2024, claiming that the Plaintiff Mr. Freeman initial crime was "criminal trespassing" at the Home Depot;

166. Defendant Nelson further falsely testified that Plaintiff Mr. Freeman collided his vehicle into Defendant Nelson's vehicle head on. Testifying that "I stopped. [Mr. Freeman] took his vehicle, and he ran his vehicle straight into my driver's side door, pinned me in the vehicle. "[Mr. Freeman] did knowingly make an assault by driving his Chevrolet Colorado directly into the patrol vehicle.";

167. Defendant Nelson falsely testified in court that "Randy Shirley put his hands through the window. And then he took – Freeman started taking glass and throwing it at Trooper Greer and started punching Trooper Greer in the face."

168. Defendant Greer falsely testified under oath in Court on October 1, 2024, in the "motion to revoke bond" that Plaintiff Charlie was kicking and biting the officers;

169. Defendant Greer further falsely testified that Plaintiff Mr. Freeman "grabbed the pieces of broken windshield—or not windshield, broken window and began throwing that at us and saying, fuck you, pig; fuck you, pig; fuck you, and just kept repeating that over and over again.";

170. Defendant Greer continued to falsely testify that Plaintiff Mr. Freeman "began punching and hitting us, that's when I stepped back, and I did deploy my taser."

171. Defendant Greer continued to maliciously fabricate events by stating under oath that Plaintiff Mr. Freeman punched him with "closed fist. He punched me several times in the face with a closed fist, closed hand, and was kicking as well on top of the punching. He also punched the sheriff, Mr. Randy Shirley; was punching the other trooper that was there, Trooper Vandiver, with a closed fist and kicking.";

172. Defendant Greer continued to maliciously fabricate events by stating that Plaintiff Mr. Freeman was "fighting us, kicking and spiting and trying to bite us.";

173. Defendant Greer falsely testified in Court that "once [Freeman] began punching and hitting us, that's when I stepped back, and did deploy my taser.";

174. The Superior Court Magistrate initially arbitrarily ordered Mr. Freeman be held without bond;

175. On March 31, 2025, a Judge revoked the warrant for disorderly conduct for lack of merit;

**COMPLAINT**
17

176. Bond was issued on December 17, 2024;

177. Plaintiff Mr. Freeman posted bond and was released on December 19, 2024;

178. In February 2025, Toccoa Police rehired Defendant Nelson;

179. As a direct and legal result of this incident, Plaintiff Mr. Freeman suffered severe bodily injuries;

180. As a direct and legal result of this incident, Plaintiff Charlie suffered bodily injuries;

181. As a direct and legal result of this incident, Plaintiff Mindy Sue suffered severe bodily injuries;

182. As a direct and legal result of this incident, Plaintiff Freddie suffered severe bodily injuries;

183. Since the incident, Mr. Freeman's driver's license has been revoked;

184. This incident damaged The Plaintiffs' reputation in the community;

185. This incident has affected The Plaintiffs' livelihood;

186. This incident has prevented Mr. Freeman from entering his properties.

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein

### FIRST CLAIM FOR RELIEF: FREEDOM OF SPEECH

This incident took place because the Plaintiff David Justin Freeman made a negative comment about the police to his colleague who worked at the Home Depot. Defendant Nelson was dressed in sheriff's uniform. After Defendant Nelson overheard this comment, he decided to retaliate under the "colour of law". Under 42 U.S.C. § 1983, the U.S. district Courts have jurisdiction over constitutional right violations under the "color of allow". Government officials are prohibited from wielding their power selectively to punish or suppress speech under *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024). The First amendment grants Mr. Freeman the right to speech. Defendant Nelson's actions to act under the "colour of law" and supress or punish Mr. Freeman for his freedom of speech were unconstitutional. Defendant Nelson began an unlawful pursuit without probable cause. Defendant Nelson fabricate events to justify the unlawful pursuit. Defendant Nelson clearly wanted to punish Plaintiff Mr. Freeman for expressing his opinion. Ultimately, this resulted in the unlawful arrest and the battering of Plaintiff Mr. Freeman and his then 11-year-old son Charlie. Thus, Plaintiff Mr. Freeman's first amendment rights to freedom of speech were violated.

## SECOND CLAIM FOR RELIEF: FOURTH AMENDMENT VIOLATIONS OF UNREASONABLE SEARCH AND SEIZURES

On June 29, 2024, Plaintiff was lawfully operating his vehicle after leaving the Home Depot with his minor son. Plaintiff Mr. Freeman obeyed all traffic laws and travelled at a lawful speed. Prior to initiating the stop, Defendant Nelson had no interaction with Plaintiff inside the Home Depot and did not observe Plaintiff commit any crime. Despite the absence of any reasonable articulable suspicion of criminal activity, Defendant initiated a pursuit of Plaintiff. This is a clear Fourth Amendment violation under *Terry v. Ohio*, 392 U.S. 1 (1968), which prohibits unreasonable search and seizure. Defendant followed Plaintiff and falsely claimed a high-speed chase to dispatch. Defendant Nelson only activated emergency lights after initiating pursuit. When Defendant activated his emergency lights, Plaintiff did not flee but slowed his vehicle down. Plaintiff even stopped at a red light while searching for a populated area. On October 1, 2024, Defendant Nelson testified that they travelled at "20 miles per hour". On Highway 17, the speed limit is 50 miles per hour. Plaintiff travelled less than 20 miles per hour on Highway 17 and attempted to locate a safe, populated area to stop. This was not a high-speed chase. Plaintiff verbally communicated to Defendant that he did not feel safe stopping in an isolated location and was attempting to reach for a populated area. Plaintiff committed no traffic violation nor criminal offense prior to or during the seizure. Thus, Defendant Nelson's unlawful search and seizure were unconstitutional and violated Plaintiff's fourth amendment rights.

## THIRD CLAIM FOR RELIEF: FOURTH AMENDMENT VIOLATIONS OF WARRANTLESS ARREST WITHOUT PROBABLE CAUSE

The Fourth Amendment prohibits warrantless arrests. In *Barnes v. Felix*, 605 U.S. 73 (2025), the Supreme Court prohibited warrantless arrests without probable cause. At the time of the incident, Defendant Nelson did not have articulable facts of criminal activity afoot. None of the other Defendants had any reason, nor any articulable facts, nor probable cause for the arrest. All the Defendants lacked probable cause at all times of the arrest. A warrant was first issued the following day after the arrest on June 30, 2024, for simple assault. This warrant did not name a judge nor was it signed by a judge. A second warrant was issued for disorderly conduct on July 9, 2024, ten days after the incident. Also, the second warrant did not name a judge nor was it

signed by a judge. This arrest was warrantless without probable cause. On October 1, 2024, four months after the incident, Defendant Nelson testified in Court that he "did not have probable cause at the time" of the incident. These are clear violations of Plaintiff Mr. Freeman's fourth amendment Constitutional rights.

### FOURTH CLAIM FOR RELIEF: FOURTH AMENDMENT VIOLATIONS OF EXCESSIVE FORCE AND IMPROPER USE OF DEADLY WEAPONS

The US Supreme Court held in *Tennessee v. Garner*, 471 U. S. 1, 9 (1985), that law enforcement officer's use of deadly force is prohibited when the "totality of the circumstances" does not justify so. In *Graham v. Connor*, 490 U. S. 386, 397 (1989), the US Supreme Court prohibited a law enforcement officer's use of deadly force when it is not "objectively reasonable." The Court identified several factors to be included in the assessment of the facts and circumstances surrounding a particular use of force: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Id*. The Eighth Amendment and Supreme Court cases such as *Weems v. United States*, 217 U.S. 349 (1910), prohibit cruel and unusual punishment. The Supreme Court ruled in *Estelle v. Gamble*, 429 U.S. 97 (1976), that it is an Eighth Amendment violation for "deliberate indifference" to an inmate's serious medical needs and constitutes cruel and unusual punishment under the Eighth Amendment and violates their constitutional rights.

The totality of the circumstances did not justify the Defendants use of deadly force. Upon Plaintiff's return to the Home Depot parking lot, Defendants intentionally blocked and collided into Plaintiff's vehicle causing an automobile collision where Plaintiff's airbags deployed. A car is legally considered a deadly weapon when used with the intent to cause serious bodily injury, death, or driven in a highly reckless manner. Plaintiff and his minor son were audibly calling for help when Defendants aimed guns, pistols and semi-automatic rifles at the unarmed father and son.

Defendants use of deadly force was not objectively reasonable. As already established above, there was no crime at issue. None of the Defendants had probable cause for the stop. Plaintiff made a negative comment to his colleague about the police at Home Depot. This is not a crime. Also, Plaintiffs did not pose any immediate threat to the safety of officers nor did the

**COMPLAINT**
20

Plaintiffs resist an arrest or attempt to flea. Plaintiff sat in his vehicle while Defendants forcibly shattered Plaintiff's windows. Violently removed the minor Plaintiff Charlie before the Defendants proceeded to taser Plaintiff Mr. Freeman with at least three different tasers. Tasers are considered deadly weapons. Defendants then began to brutality strike Plaintiff Mr. Freeman with their closed fists. The Defendants continued to strike Plaintiff Mr. Freeman's head until they fractured his skull and broke his ribs. At all times, Plaintiff Mr. Freeman was still in his vehicle, did not strike back at Defendants and was not resisting arrest. After Defendants pulled Plaintiff Mr. Freeman out of the vehicle, the Defendants proceeded to jump on his body in cowboy boots while he was handcuffed.

As for the minor Plaintiff child, Charlie, Plaintiff's minor son, Charlie Freeman was unarmed, compliant, and not suspected of any wrongdoing. Defendants pointed firearms at the minor and forcibly removed him from the vehicle. The minor was yanked out of the car, put in a headlock, thrown to the ground and sustained physical injuries, including bleeding. The use of force against the minor was objectively unreasonable.

Also, only after Plaintiff Mr. Freeman posted bail, was able visit a doctor in 2025 to removed pieces of glass that remained embedded in his arm from Defendants attack. Denial is of medical treatment is a constitutional violation.

The force used was objectively unreasonable and grossly disproportionate. The use of such force against a non-resisting, unarmed individual violated clearly established law. No reasonable officer could have believed such force was lawful. Given these facts the totality of the circumstances did not justify the use of deadly force. These are Fourth Amendment violations.

## FIFTH CLAIM FOR RELIEF: CONSTITUTIONAL VIOLATIONS OF UNLAWFUL IMPRISONMENT

Laws against unlawful imprisonment are clearly established under 18 U.S.C. § 1584 and 10 U.S.C. § 897, in addition to the Fourth, Eighth and Fourteenth Amendment. In the present case, Plaintiff Mr. Freeman was wrongfully imprisoned for six months. He was arrested on June 29, 2024. He was held without bond until December 17, 2024. He paid bail and was released from prison on December 19, 2024. This unlawful imprisonment is a constitutional violation.

//

**COMPLAINT**
21

## SIXTH CLAIM FOR RELIEF: FOURTEENTH AMENDMEND VIOLATION OF MALICIOUS PROSECUTION

Perjury is considered a felony. The Supreme Court interprets perjury cases strictly under 18 U.S.C. § 1621. It requires proof of willful, knowingly false statements, while holding that technically true but evasive answers are not criminal. In *Bronston v. United States*, 409 U.S. 352 (1973), the US Supreme Court  ruled that perjury requires deliberate falsity, not merely misleading answers, and requires strong evidence of intent to deceive. The Supreme Court ruled in *McDonald v. Smith*, 472 US 479 (1985) that the First Amendment does not offer absolute immunity for defamation. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) the U.S. Supreme Court decision ruled that private individuals do not need to prove "actual malice" to recover damages for defamation. The Court determined private figures need more protection than public figures, allowing states to set lower standards of fault such as negligence to prove defamation, provided they don't allow punitive damages without actual malice. In *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964) the Supreme Court defined malice in a claim of defamation or libel, as the defendant knew that a statement was false or with reckless disregard for whether it was false or not. In *Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024), The Supreme Court held that malicious-prosecution claims can proceed even if only one charge in a criminal proceeding lacks probable cause.

To Justify the unlawful arrest and beating of Plaintiff Mr. Freeman, many of the Defendants in hopes of regaining positive public opinion, deliberately and maliciously falsely reported defamatory statements about Plaintiff Mr. Freeman and of the incident. Defendants deliberately reported false information with the intent to deceive. Some of these untruthful defamatory statements were made to news reporters and other statements were made under oath which is considered perjury. Perjury is a felony.

Firstly, immediately after the attack on the unarmed Plaintiffs, Defendant Nelson was asked about the reason for the initial stop. Defendant Nelson said and this is verified from body camera footage from other Defendants saying "[H]e backed that red truck up, like he 'bout to hit me" was the reason for the arrest. This is statement is clearly deceptive. Several video recordings of the incident from different angles clearly show Mr. Freeman safely backing up with great distance between Mr. Freeman and Defendant Nelson. This story of the backing up changed in

October 2024, while Defendant Nelson testified under oath and was sworn in a legal proceeding when he stated that Mr. Freeman "came approximately probably about maybe about five feet. So, he had the opportunity to reverse-reverse". In that same Court proceeding Defendant Nelson admitted to the Court stating that "I did not have probable cause at that time".

Secondly, Defendant Nelson maliciously and falsely reported to the news outlets that published a story that claimed Mr. Freeman cussed and used defamatory language towards and physically assaulted Defendant Nelson first which initiated the arrest and accused Mr. Freeman of saying "[Y]ou're a piece of shit, you need to die" that a manager hand to step in and an older lady commented on this interaction. Clearly, this statement is untrue and meant to deceive. Video surveillance and witnesses can testify that Mr. Freeman never engaged in any conversation with Defendant Nelson. Mr. Freeman never made any threats nor used any profanity laced language towards Defendant Nelson.

Thirdly, under oath in October 2024, Defendant Nelson testified that the initial reason for the arrest was that Mr. Freeman was criminally trespassing in the Home Depot. This is not true and is meant to deceive.

Fourthly, in the same Court proceeding, Defendant Nelson falsely testifies that Mr. Freeman "ran the stop sign across from Memorial on Walmart Way". There is no stop sign across from Memorial Drive on Walmart Way. Memorial Drive and Walmart Way do not intersect. In addition, there are no stop signs visible from where Defendant was standing at the time the pursuit began.

Fifthly, defendant Nelson also falsely claimed that there was a "hot pursuit". However, the videos show the Plaintiff clearly obeying the laws and stops are the red light and was traveling less than 20 miles per hour over the entire course of five minutes and forty seconds. In addition, on October 1, 2024, Defendant Nelson testified in court that they travelled 20 miles per hour while on the Highway. This is not a high-speed chase.

Sixthly, Defendant Nelson further falsely testified under oath that Plaintiff Mr. Freeman collided his vehicle into Defendant Nelson's vehicle. Testifying that "I stopped. [Mr. Freeman] took his vehicle, and he ran his vehicle straight into my driver's side door, pinned me in the vehicle…. Then another police officer, Palmer, Jay Palmer, he ran and said, hey, man, you all right? He immediately took his weapon out, and he pulled my door open, and he said,

man get out the vehicle. You sure you straight? I said, yes." And "[Mr. Freeman] did knowingly make an assault by driving his Chevrolet Colorado directly into the patrol vehicle.". The video captures Defendant Nelson intentionally colliding to Plaintiff's vehicle. The video clearly captures, Defendant Nelson leaving his vehicle without assistance from anyone. The video clearly shows that there was no conversation between Defendant Nelson and Defendant Palmer. The entire conversation between Defendant Palmer and Defendant Nelson is fabricated. Defendant Nelson was never pinned in his patrol vehicle. Defendant Nelson stepped out of his vehicle without any injury and did not need assistance.  Defendant Nelson fabricated entire events that never took place under oath with the intent to deceive. This is perjury.

Seventhly, Defendant Nelson further falsely testified in court that "Randy Shirley put his hands through the window. And then he took – Freeman started taking glass and throwing it at Trooper Greer and started punching Trooper Greer in the face." None of this happened. The video accurately recorded the arrest. The Defendants broke Plaintiff's windshields that proceeded to taser him with three different tasers and brutally and violently attack him while Plaintiff did not strike back.

Defendant Nelson was not the only Defendant making false claims with malice against the Plaintiffs. Many of the other Defendants reported to the news and the community that Mr. Freeman started the attacks on the Defendants. Video surveillance of the incident proves these statements are made with Malice since the Defendants knew these statements were false and untrue. These statements were made with clear and reckless disregard to their truth. For instance, Defendants fabricated stories as to why it was necessary for them to attack the Plaintiffs by claiming the Plaintiff attacked first. None of the Defendants were not injured. Defendants falsely testify under oath that Mr. Freeman attacked them first and that he was so violent the Defendants were all covered in blood. Defendants were all covered in Plaintiff David Justin Freeman's blood after they beat him to the ground.

Eighthly, Defendant Greer also falsely testified under oath in Court on October 1, 2024, in the "motion to revoke bond" that Plaintiff Charlie was kicking and biting the officers. Video clearly shows the Plaintiff Charlie is a minor and he did not resist or strike back. The Defendants put Plaintiff Charlie in a chokehold and threw him to the ground.

Ninthly, Defendant Greer further falsely testified that Plaintiff Mr. Freeman "grabbed the pieces of broken windshield—or not windshield, broken window and began throwing that at us and saying, fuck you, pig; fuck you, pig; fuck you, and just kept repeating that over and over again." None of this happened. The video accurately recorded the arrest. The Defendants broke Plaintiff's windshields. Plaintiff didn't even say a word as they beat him. Plaintiff was crying and screaming from agonizing pain. Plaintiff didn't even fight back.

Tenthly, Defendant Greer continued to falsely testify that Plaintiff Mr. Freeman "began punching and hitting us, that's when I stepped back, and I did deploy my taser." Again, this did not happen. Plaintiff Mr. Freeman never fought back.

Eleventhly, Defendant Greer continued to maliciously fabricate events by stating under oath that Plaintiff Mr. Freeman punched him with "closed fist. He punched me several times in the face with a closed fist, closed hand, and was kicking as well on top of the punching. He also punched the sheriff, Mr. Randy Shirley; was punching the other trooper that was there, Trooper Vandiver, with a closed fist and kicking.". This also did not happen. The only person beat with closed fists was Plaintiff Mr. Freeman who did not fight back. The videos clearly show what happened.

Twelfthly, Defendant Greer continued to maliciously fabricate events by stating that Plaintiff Mr. Freeman was "fighting us, kicking and spiting and trying to bite us."; This also did not happen. The only person beat with closed fists was Plaintiff Mr. Freeman who did not fight back. The videos clearly show what happened.

These are just a few of the statements. There are many more defamatory statements made by the Defendants against the Plaintiffs. Many of the defamatory statements that Defendants were made under oath, to the press or the general community. These statements were deliberately made with the intent to deceive the Court, the community or to justify the unlawful arrest and beating of an unarmed father and minor son. These statements were made under oath. These statements have negatively affected the Plaintiffs. The Defendants knew these statements were false and untrue. These statements were made with clear and reckless disregard to their truth. These statements are defamatory. These deceptive Defendants are committing perjury and Plaintiffs are entitled to constitutional remedies. All the charges against Plaintiff Freeman lack probable cause. The initial stop in this claim did not have any merit. Defendant Nelson who

**COMPLAINT**
25

initiated the stop even testified in Court in October 2024, that he did not have probable cause at the time of the incident. Also, the disorderly conduct charge was dropped for lack of merit. Yet, Mr. Freeman was still imprisoned for six months and he still being prosecuted. It is clear to any ordinary reasonable prudent person who watches the captured videos of the incident would easily conclude that the Defendants acted improperly. This continual prosecution is improperly motived. Defendants are acting out of malice. The motivation to continue to prosecute Plaintiff Mr. Freeman is not to enforce law but to cover up the Defendants unlawful actions. This a malicious-prosecution claim.

### SEVENTH CLAIM FOR RELIEF: SUPPLEMENTAL STATE LAW CLAIMS (28 U.S.C. § 1367)

This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same nucleus of operative facts as Plaintiff's federal claims.

### EIGHTH CLAIM FOR RELIEF: VICARIOUS LIABILITY

The Supreme Court in many cases holds employers vicariously liable for their employees' actions within the scope of employment. In cases such as *Burlington Industries, Inc. v. Ellerth*, the US Supreme Court held that employers are liable if supervisors create hostile work environment. The US Supreme Court further defined the term "supervisor" in *Vance v. Ball State University*, 570 U.S. 421 (2013), as someone with the power to fire, demote, promote, transfer, or discipline. The Court factored: 1) background check failures; 2) inadequate monitoring; 3) dangerous employees; 4) unsuitability for the role; 5) employer's knowledge of unsuitability.

The constitutional violations described herein were caused by policies, customs, or practices of the Defendant governmental entities. These customs and policies created hostile work environment. This clearly demonstrated by the current case, where a minor is held at gun point by State law enforcement without probable cause. These include failures to properly hire suitable candidates, perform background checks, adequate training and monitoring of their employee are all evident in the present case. It is clear that the Defendants lacked adequate training regarding lawful stops, de-escalation, and the use of force.

Prior to the incident, Defendant Nelson worked as a jailer for Stephens County where he was let go and was "[N]ot eligible for rehire". Also, prior to the incident, Defendant Nelson had repeated disciplinary problems as a deputy between 2021 and the date of this incident. Defendant Nelson clearly has problems with obeying orders. A simple background check on Defendant Nelson would have revealed that he was unfit to carry a gun in the name of law.

The government entities further failed to supervise and discipline officers who engaged in unconstitutional conduct that day and on prior occasions. On the day of the incident, Defendant Nelson's actions, including initiating a stop without cause and offering shifting justifications, demonstrate systemic failures. Other Defendants didn't question the reason for the probable cause before beating the Plaintiffs.

Supervisors such as Sheriff Ron Nesbitt had an extra duty to supervise his employees before relishing in the attack of an innocent man. Defendant Nesbitt had an extra duty to set the example for his subordinates. Instead, all the Defendants decided to savour the moment of attacking an unarmed father and son in their vehicle before even asking for the reason of the arrest. Many of the Defendants can be heard laughing at the needlessly vicious attack.

Defendant Nelson is unsuitable for the role of a law enforcement officer. Given Defendant Nelson a gun to apply the law is dangerous. The governmental entities were deliberately indifferent to the rights of citizens. Defendant Nelson had the reputation of being hostile. For instance, multiple complaints of Defendant Nelson were emailed by the fire department chief, Bryon Bennett, who described Defendant Nelson as "hostile" and "verbally abusive" towards fire fighters.

The governmental entities are deliberately indifferent to the rights of citizens. In February 2025, the Tacooa Police hired Defendant Nelson as an officer of the law. Even after this incident and many other disciplinary actions taken against Defendant Nelson, the governmental entities knew or should know of the risk posed by Defendant Nelson and are indifferent to his conduct.

//

//

**COMPLAINT**
27

## NINTH CLAIM FOR RELIEF: DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity is a judicially created legal doctrine that shields government officials, including police officers, from civil liability for actions taken during their duties, unless they violated "clearly established" statutory or constitutional rights. In *Pearson v. Callahan*, 555 U.S. 223 (2009), the US Supreme Court implemented a two-part test to determine if this immunity applies: (1) whether the official violated a constitutional right, and (2) whether that right was clearly established at the time of the misconduct.

At all times relevant to this action, Defendants were acting under color of state law. Defendants are not entitled to qualified immunity because their conduct violated Plaintiff's clearly established constitutional rights:

First reason why Qualified Immunity does not apply is because Plaintiff has the fundamental right to free speech under the First Amendment. This entire incident occurred because Defendants wanted to punish Plaintiff for expressing his opinion. This was already established at the time of incident.

Second reason why Qualified Immunity does not apply is because it was established at the time of the incident that a law enforcement officers may not initiate a traffic stop or detention absent reasonable suspicion based on articulable facts that a crime has been or is being committed or is about to be committed. Unreasonable search and seizures are Fourth Amendment violations. Defendant in this case did not have reasonable suspicion of a crime being afoot. Defendant followed the father and son duo out of the store because Defendant did not agree with Plaintiff's comments made in passing to his colleague. Defendant fabricated events and scenarios that did not occur to justify the unconstitutional behaviour. Despite the absence of any lawful basis, Defendants initiated a stop, seized Plaintiff, and subjected him to arrest without probable cause.

Third reason why Qualified Immunity does not apply is because it was clearly established that an arrest without probable cause violates the Fourth Amendment. At the

**COMPLAINT**
28

time of the incident, Plaintiff was unarmed, complied with traffic laws, even stopping at a red light. Plaintiff had not committed any crime. Plaintiff did not flee from law enforcement but instead slowed his vehicle and attempted to locate a safe, populated area to stop, which he communicated to Defendants. Defendant admitted under oath to not having probable cause for this arrest four months after it occurred.

Fourth reason why Qualified Immunity does not apply is because it was clearly established that the use of force against an unarmed, non-threatening, and non-resisting individual is excessive, cruel, unusual punishment and unconstitutional. The father and son duo were unarmed when Defendants began their attacks and use of deadly weapons.  Defendants then used objectively unreasonable and excessive force, including drawing firearms, deploying a taser, and repeatedly striking Plaintiff, even after he was visibly injured. Defendants also used force against Plaintiff's minor child, who posed no threat and was not suspected of any wrongdoing. Pointing firearms at compliant, unarmed individuals including minors; and using significant physical force in the absence of a threat violates the Fourth Amendment.

Fifth reason why Qualified Immunity does not apply is because fifth amendment right to Miranda Rights were already established prior to the Defendants arrest of Plaintiffs. The Supreme Court in *Miranda v. Arizona, 384 U.S. 436 (1966),* establishes that law enforcement must inform the suspect of his or her Miranda rights before interrogation.  Plaintiffs were never read their Miranda Rights. Mr. Freeman was never read his Miranda rights while beaten, arrested no during his entire six-month imprisonment. Also, Defendants questioned the son, Charlie, without the present of a lawyer nor parent. Then, the Defendants refused to release Charlie to his mother unless she answered questions. The mother was never a suspect. Only after she demanded a lawyer did the Defendants release her and her son. Thus, Plaintiffs' fifth amendment rights were violated.

Sixth reason why Qualified Immunity does not apply is because the Constitution already established law against unlawful imprisonment prior to Plaintiff's unlawful imprisonment. Plaintiff Mr. Freeman was arrested on June 29, 2024. He was held without bond until December

17, 2024. He paid bail and was released from prison on December 19, 2024. These are clear violations of the fourth, sixth, eighth and fourteen amendments.

Seventh reason why Qualified Immunity does not apply is because the Defendants are intentionally defaming Plaintiff. This is a clear violation of the fourteenth amendment.

Eighth reason why Qualified Immunity does not apply is because the Plaintiff is maliciously prosecuted for crimes fabricated by Defendants. This is a clear violation of the fourteenth amendment.

Therefore, Defendants are not entitled to qualified immunity.

## DAMAGES

The Court has jurisdiction over this action under 28 U.S.C. §§1331-1343. As a direct and proximate result of Defendants' conduct, the Plaintiffs suffered damages. Plaintiffs are entitled to compensatory and punitive damages as allowed by law for:

a. Severe bodily injuries;
b. Pain and suffering;
c. Emotional distress;
d. Loss of liberty;
e. Loss of use of property;
f. Loss of income past and future;
g. Loss to public image and reputation;
e. Medical expenses and denial of medical care;
f. Economic losses.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

**Plaintiff David Justin Freeman:**

1. Economic Special Compensatory Damages including past and future medical expenses;

**COMPLAINT**
30

2. Economic Special Compensatory Damages including past lost wages and loss of future earnings potential;

3. Past and Future Non-Economic Compensatory Damages including physical pain and suffering, mental suffering, emotional anguish, disfigurement and scarring, loss of enjoyment of life, physical impairment, inconvenience, grief, anxiety, humiliation and emotional distress;

4. Non-Economic Damages including loss of comfort, loss of protection and loss of society;

5. Compensatory Damages for loss of liberty resulting from Plaintiff's unlawful detention and arrest;

6. Damages for loss of consortium on behalf of Plaintiff's spouse;

7. Punitive Damages against the Defendants in an amount sufficient to punish and deter similar misconduct, due to their willful, malicious, and reckless disregard for Plaintiff's constitutional rights;

8. Punitive Damages for Slander, Libel and Malicious Prosecution;

9. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law;

10. Pre-judgment and post-judgment interest as allowed by law;

11. Such other and further relief as this Court deems just and proper.

**Plaintiff Charlie Freeman;**

11. Economic Compensatory Damages on behalf of Plaintiff's minor child, Charlie, for past and future medical expenses;

12. Non-Economic Compensatory Damages on behalf of Plaintiff's minor child, Charlie for pain and suffering, emotional distress, and trauma resulting from Defendants' conduct;

13. Compensatory Damages for loss of liberty resulting from Plaintiff's unlawful detention and arrest;

14. Punitive Damages against the Defendants in an amount sufficient to punish and deter similar misconduct, due to their willful, malicious, and reckless disregard for Plaintiff's constitutional rights;

15. Punitive Damages for Slander, Libel and Malicious Prosecution;

COMPLAINT

31

16. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law;

17. Pre-judgment and post-judgment interest as allowed by law;

18. Such other and further relief as this Court deems just and proper.

**Plaintiff Mindy Sue Freeman;**

18. Economic Special Compensatory Damages including past and future medical expenses;

19. Economic Special Compensatory Damages including past lost wages and loss of future earnings potential;

20. Past and Future Non-Economic Compensatory Damages including physical pain and suffering, mental suffering, emotional anguish, disfigurement and scarring, loss of enjoyment of life, physical impairment, inconvenience, grief, anxiety, humiliation and emotional distress;

21. Non-Economic Damages including loss of comfort, loss of protection and loss of society;

22. Damages for loss of consortium on behalf of Plaintiff's spouse;

23. Punitive Damages against the Defendants in an amount sufficient to punish and deter similar misconduct, due to their willful, malicious, and reckless disregard for Plaintiff's constitutional rights;

24. Punitive Damages for Slander, Libel and Malicious Prosecution;

25. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law;

26. Pre-judgment and post-judgment interest as allowed by law;

27. Such other and further relief as this Court deems just and proper.

**Plaintiff Freddie Freeman;**

27. Economic Special Compensatory Damages including past and future medical expenses;

28. Economic Special Compensatory Damages including past lost wages and loss of future earnings potential;

29. Past and Future Non-Economic Compensatory Damages including physical pain and suffering, mental suffering, emotional anguish, disfigurement and scarring, loss of

enjoyment of life, physical impairment, inconvenience, grief, anxiety, humiliation and emotional distress;

30. Non-Economic Damages including loss of comfort, loss of protection and loss of society;

31. Punitive Damages against the Defendants in an amount sufficient to punish and deter similar misconduct, due to their willful, malicious, and reckless disregard for Plaintiff's constitutional rights;

32. Punitive Damages for Slander, Libel and Malicious Prosecution;

33. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law;

34. Pre-judgment and post-judgment interest as allowed by law;

35. Such other and further relief as this Court deems just and proper.

//

//

Dated: May 1, 2026

Libra Law Firm

By:

JOY CHRISTINA SMITH, ESQ.

Attorneys for Plaintiffs

Bar No. 191622

The Libra Law Firm

3370 Peachtree Rd NE 700 123,

Atlanta, GA 30326

**COMPLAINT**
33